IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 09–cv–02889–WYD–KMT

ANDREW L. McCARGO,

     Plaintiff,

v.

TEXAS ROADHOUSE, INC., a Delaware corporation,

     Defendant.

---

**ORDER**

---

This case comes before the court on "Plaintiff's Motion for Sanctions due to the Spoliation of Video Recordings" (Doc. No. 146 [Mot.], filed February 3, 2011).  Defendant filed its response on February 24, 2011 (Doc. No. 155 [Resp.]), and Plaintiff filed his reply on March 9, 2011 (Doc. No. 161 [Reply].)  This court held a hearing on March 15, 2011.  Following oral argument, this court granted Plaintiff's Motion for Sanctions and took under advisement the type of sanctions to be awarded.  (*See* Doc. No. 164.)

Pursuant to Chief Judge Daniel's Order of Reference to Magistrate Judge (Doc. No. 3), and pursuant to 28 U.S.C. § 636(b)(1)(A) through (C) and Fed.R.Civ.P. 72(a) and (b), because this court has not made a ruling which finally resolves a party's claim or defense, this court has authority to issue an order for sanctions.

## I.     BACKGROUND

This case arises from Plaintiff's brief employment with Texas Roadhouse, Inc., at a

location in Colorado Springs.  (Doc. No. 1 [Compl.], ¶ 7.)  Plaintiff asserts claims of racial

discrimination pursuant to 42 U.S.C. § 1981.  (*See id.*)  Plaintiff generally alleges he, because he

is an African-American man, was paid below his skill level, denied promotions, was not

scheduled to work as many hours as white men in his same position, and he was subjected to a

hostile working environment.  (*See id.*, ¶¶ 4, 16–24.)

During the course of the Plaintiff's employment at Texas Roadhouse Restaurant No. 48

he worked shifts on October 30, 31, November 3, 4, 9, 10, 11, 13, 15, 16, 17, 19, 20, 23, 24, 25,

27, 28, 30, December 1, 2, 3, and 7, 2009.  (Doc. No. 113, ¶ 2.)  Plaintiff alleges on November

23, 2009, the kitchen manager made a comment about lynching to one of Plaintiff's co-workers.

(Compl., ¶ 24.)  Later that evening, Plaintiff alleges a coworker, Robert Carter, attempted to set

Plaintiff's clothing on fire with a cigarette lighter.  (*Id.*)  Plaintiff contends another coworker,

Angela Mills, added a tea bag, which has symbolic significance to African-Americans as a

symbol of lynching, to the paper Carter used to start the fire.  (*Id.*, ¶¶ 25–26, 31.)  Plaintiff felt

heat on his back, and the kitchen manager patted the fire out.  (*Id.*, ¶ 25)  Plaintiff alleges the

kitchen staff and the managers laughed.  (*Id.*)  Plaintiff reported the incident to police officers,

who recommended to the restaurant managers that Carter be sent home.  (*Id.*, ¶ 28–29.)  Plaintiff

alleges the managers took no corrective action that night and treated the assault as a joke.  (*Id.*, ¶

29.)

The following day, Plaintiff and Carter returned to work.  (*Id.*, ¶ 30.)  On November 25, 2009, Plaintiff reported the incident to Defendant's corporate offices by electronic submission and by certified mail.  (*Id.*, ¶ 32.)  Plaintiff alleges no corrective action was taken by Defendant until November 27, 2009, when the restaurant manager told Plaintiff that Carter and Mills were being suspended.  (*Id.*, ¶ 33.)  Plaintiff alleges in the days following the incident, he continued to endure insult, humiliation, and harassment from coworkers and management.  (*Id.*, ¶ 34.)

## II.    *PRESERVATION LETTERS AND DISCOVERY REQUESTS*

On December 4, 2009, Plaintiff's counsel hand delivered an evidence preservation letter to Steve Miller, the Market Partner of Texas Roadhouse.  (Mot., Ex. 6.)  Plaintiff filed his Complaint in this Court on December 10, 2009.  (*See id.*)  On December 11, 2009, Plaintiff's counsel sent another evidence preservation letter to Defendant's attorney, Sonja McKenzie. (Mot., Ex. 2.)  Plaintiff, during the course of  discovery in this case, sought three categories of video recordings, including (1) pre-November 23, 2009 video recordings; 2) November 23, 2009 video recordings; and 3) post-November 23, 2009 video recordings.  (Mot. at 2.)

Defendant states that the restaurant has seven cameras, only two of which are located in the kitchen.  (Resp. at 2.)  One kitchen camera is located adjacent to the managers' office door and faces the back door, and the other records footage near the meat cooler.  (*Id.*; Mot., Ex. 1 at 3.)  Defendant states that the only camera that would have recorded the location where Plaintiff worked is the camera in the meat cooler area.  (*Id.*)  In addition to the cameras in the kitchen area, there are cameras located outside of the restaurant showing the employee entrance, in the front of the "house" (restaurant) in the bar area, near the rear door, inside the main

entrance/lobby area, and at the Cash Link.  (*Id.*; Ex. B at 142, l. 11–143, l. 5; Mot. Ex. 1 at 3.)

Each camera records video on a continual basis each night, and video footage is recorded over

after a certain number of days based on the quality of the picture and the amount of the data

cycle.  (Mot., Ex. 1 at 3; Resp., Ex. H at 10, ll. 16–21.)  Video recordings were destroyed

through the automatic overwriting procedure in all three categories of videos sought by Plaintiff

on dates after both Defendant's management and Defendant's counsel had received evidence

preservation letters specifically requesting the preservation of all video recordings.  (Mot., Ex. 5,

¶ 5a.)  Defendant preserved video footage, and provided the footage to Plaintiff, from November

23, 2009, November 4, 9, 10, 11, 13, 15, 16, and 19, 2009.  (Resp. at 3.)  There is no dispute that,

in total, video recordings from October 30, 31, November 3, 17, 20, 24, 25, 27, 28, 30, December

1, 2, 3, and 7, 2009 were overwritten and not preserved.  (*Id.*)

## II.   ANALYSIS

" 'Spoliation is the destruction or significant alteration of evidence, or failure to preserve

property for another's use as evidence in pending or reasonably foreseeable litigation.' "

*Blangsted v. Snowmass-Wildcat Fire Prot. Dist.,* 642 F. Supp. 2d 1250, 1259–60 (D. Colo. 2009)

(quoting *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d 450, 457 (2d Cir.

2007)).  A court has both inherent power as well as authority under Federal Rule of Civil

Procedure 37(b)(2) to sanction a litigant for the destruction or loss of evidence.  *See Chambers v.

NASCO, Inc.,* 501 U.S. 32, 43-45 (1991); *Silvestri v. Gen. Motors Corp.,* 271 F.3d 583, 590 (4th

Cir. 2001); *Smith v. Nw. Fin. Acceptance, Inc.,* 129 F.3d 1408 (10th Cir. 1997).

"In determining whether sanctions are appropriate [based on a claim of spoliation], the court must . . . determine whether the missing documents or materials would be relevant to an issue at trial." *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 621 (D. Colo. 2007).  Sanctions for spoliation of evidence are appropriate when (1) a party had a duty to preserve the evidence because it knew, or should have known, that litigation was imminent, and (2) the other party was prejudiced by the destruction of the evidence. *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009).  The burden is on the moving party to prove, by a preponderance of the evidence, that the opposing party failed to preserve evidence or destroyed it. *See In re Krause*, 367 B.R. 740, 764 (D. Kan. 2007).

"When deciding whether to sanction a party for the spoliation of evidence, courts have considered a variety of factors, two of which generally carry the most weight: (1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the degree of actual prejudice to the other party." *Blangsted*, 642 F. Supp. 2d at 1260.

### A.    Duty to Preserve Evidence

Defendant does not dispute that there was a duty to preserve evidence and that evidence was destroyed.  Rather, Defendant argues that it could not have reasonably anticipated legal action concerning any events other than the incident on November 23, 2009.  (Resp. at 7.) However, upon a review of the evidence preservation letters sent to Mr. Miller and Ms. McKenzie, this court disagrees.

With regard to the duty to preserve,

> [ordinarily] the duty to preserve evidence is triggered by the filing of a lawsuit. However, the obligation to preserve evidence may arise even earlier if a party has notice that future litigation is likely.  The undeniable reality is that litigation is an ever-present possibility in our society.  While a party should not be permitted to destroy potential evidence after receiving unequivocal notice of impending litigation, the duty to preserve relevant documents should require more than a mere possibility of litigation.  Ultimately, the court's decision [on the duty to preserve] must be guided by the facts of each case.

*Cache La Poudre*, 244 F.R.D. at 621 (internal quotations and citations omitted).

> It is well established that the duty to preserve evidence arises when a party reasonably anticipates litigation.  Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents.

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010) (internal citations and quotations omitted).  The duty to preserve means action must be taken to preserve evidence, meaning that it is not lost, destroyed, inadvertently or negligently overwritten, or intentionally wiped out, and that it is available to be produced to the other side.  *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004).

On November 24, 2009, Plaintiff met with Tom Skipworth, the restaurant manager.  (Mot at 9.)  In his report regarding the meeting, Mr. Skipworth notes that Plaintiff "intends to take legal action against those involved."  (*Id.*, Ex. 9 at 2.)  On November 25, 2009, Plaintiff filed a formal internal complaint with Defendant in which he alleged he had been the victim of a hate crime on November 23, 2009, and that other "racial behaviors" had been ongoing for one to three months.  (*Id.*, Ex. 8 at 2, 3.)  Plaintiff gave a detailed description of alleged racially

discriminatory practices, including his being hired below his skill level, being offered an hourly

wage below the level offered to others in the same position, and regarding the November 23,

2009, fire incident.  (*Id.*)  Plaintiff stated he would "continue to move this matter forward within

the confines of the legal system."  (*Id.* at 2.)

On November 29, 2009, Mr. Skipworth summarized the events of November 23, 2009,

and concluded that "[h]anging the tea bag . . . potentially created a hostile work environment for

him" and "[s]etting a person on fire creates a hostile work environment for anyone – without

question."  (*Id.*, Ex. 9 at 3.)  On November 30, 2009, Mark Simpson of Texas Roadhouse Human

Resources wrote an email to Mr. Miller, expressing his concern about a pattern of racism at the

Colorado Springs location.  (*Id.*, Ex. 10.)  Mr. Simpson surmised that Plaintiff "has an attorney"

and, therefore, the investigation should be done by the book.  (*Id.*)

Based on the information presented in the parties' briefs and during the hearing, this

court finds Defendant's initial duty to preserve evidence was triggered by Plaintiff's formal

internal complaint on November 25, 2009, that Plaintiff intended to pursue legal action.  The

formal internal complaint put Defendant on notice that Plaintiff was alleging a pattern of a

racially hostile environment that had been ongoing since the day he was hired; thus, beginning

on November 25, 2009, Defendant should have preserved all video that would have shown

Plaintiff.  This duty was reiterated with Plaintiff's counsel's evidence preservation letter of

December 4, 2009, which clearly stated the scope of the duty to preserve all "all surveillance

video, digital surveillance video and all other recordings depicting Mr. McCargo" (Mot., Ex. 6.)

This court finds, therefore, that beginning November 25, 2009, Defendant only had a duty to

preserve all video recordings of Plaintiff, including any video from the two cameras in the kitchen area where Plaintiff worked–even those recorded on dates other than November 23, 2009. However, the court finds Defendant was not under a duty to preserve video from outside the kitchen area where Defendant could not have reasonably anticipated Plaintiff would have been recorded.

The court also finds the scope of Defendant's duty to preserve the video recordings was expanded with the December 11, 2009, evidence preservation letter, which maintained the request to preserve "all video recording of Mr. McCargo taken on November 23, 2009 or any other video recordings of him" and, additionally, requested preservation of all video taken outside the restaurant and of the kitchen staff on November 23, 2009. (Mot., Ex. 2.) Thus, beginning December 11, 2009, in addition to its duty to preserve all video recordings of Plaintiff, Defendant also had a duty to preserve all videos taken outside the restaurant and of the kitchen staff on November 23, 2009. The court finds, however, that Defendant was not under a duty, even after December 11, 2009, to preserve any video recordings from outside the kitchen area, except for all video recordings from November 23, 2009.

## B.    *Spoliated Evidence*

Though the defendant did produce video taken from two kitchen cameras and the camera outside the employee entrance from 7:54 p.m. to 9:30 p.m. on November 23, 2009 (*see* Resp. at 3), Defendant does not dispute that it did not preserve any video footage from prior to 7:54 p.m. or after 9:30 p.m. on November 23, 2009 (*id.* at 3–4). Defendant also did not preserve video footage from any camera outside of the kitchen except for video from the employee entrance on

8

November 23, 2009.  (*Id.*)  Finally, Defendant did not preserve any video recordings from

Plaintiff's shifts on October 30 and 31, November 3, 17, 20, 24, 26, 27, 30, and December 1, 2, 3

and 7, 2009.  (*Id.*)

### 1.   *Video from November 17, 20, 23 24, 26, 27, 30, and December 1, 2, 3 and 7, 2009*

This court has already found that, beginning November 25, 2009, Defendant was under a

duty to preserve all video footage from the two cameras in the kitchen area where Plaintiff

worked.  In his deposition, Mr. Skipworth testified that when he received a preservation letter, he

began recording the video footage, and, due to the automatic overwriting system, the first day

that was available that had not been overwritten was November 4, 2009.  (Resp, Ex. H at 10, ll.

12–15.)  Thus, at the point Mr. Skipworth received the preservation letter and began recording,

he would have been able to preserve all video on and subsequent to November 4, 2009.  As such,

Plaintiff may be entitled to sanctions for the spoliation of the November 17, 20, 23, 24, 26, 27,

30, and December 1, 2, 3 and 7, 2009, video footage.

### 2.   *Video from October 30, 31, and November 3, 2009*

It is unclear which preservation letter prompted Mr. Skipworth to begin recording the

video footage.  In his deposition taken September 14, 2010, Mr. Skipworth testified that he

received the December 4, 2009, letter "close to" the time it was delivered to the restaurant.  (*See*

Resp, Ex. B at 140, ll. 16–21.)  In his deposition taken September 30, 2010, Mr. Skipworth

testified that he began recording sometime on or about December 8 or 9, 2009, possibly after

receiving a letter from Defendant's attorneys.  (*See id.*, Ex. H at 15, l. 20–16, l. 15.)  Giving

Defendant the benefit of the doubt, and assuming Mr. Skipworth did not begin recording until December 9, 2009, he would have been able at that time to obtain footage from any date subsequent to November 3, 2009, or thirty-five days back.  By extrapolation, if Mr. Skipworth had preserved all video footage of Plaintiff at the time the duty to preserve attached on November 25, 2009, he could have preserved video going back approximately thirty-five days from that date, or from approximately October 21, 2009.  Thus, Plaintiff also may be entitled to sanctions for the spoliation of the October 30, 31, and November 3, 2009, video footage.

### C.     Prejudice

With regard to prejudice, "[t]he burden is on the aggrieved party to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination that access to the lost material would have produced evidence favorable to his cause."  *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 104 (D. Colo. 1996) (citing cases).

The *Gates* court quoted *Wigmore on Evidence* to explain the burden upon the aggrieved party:

> Thus, when B denies the identity of the document spoliated or the identity of the document failed to be produced, no inference can be drawn until the jury find the fact against B's denial; and obviously this cannot be done until some evidence of this identity has been introduced by A.  It is this consideration of caution, this logical requirement, which seems to account partly for the rule as laid down by some courts that some evidence of the contents of the document must be introduced as a preliminary to the use of the inference.
>
> Keeping in mind, then, the object of the requirement, the rule might correctly be stated as follows: The failure or refusal to produce a relevant document, or the destruction of it, is evidence from which alone its contents may be inferred to be unfavorable to the possessor, provided the opponent, when the identity of the document is disputed, first introduces some evidence tending to

> show that the document actually destroyed or withheld is the one as to whose contents it is desired to draw an inference.  In applying this rule, care should be taken not to require anything like specific details of contents, but merely such evidence as goes to general marks of identity.

*Gates*, 167 F.R.D. at 104 (quoting 2 *Wigmore on Evidence* § 291 at 228 (emphasis in original)).

### 1. *Video from November 23, 2009*

In a hearing held on May 6, 2010, this court found the video recordings from November 23, 2009, to be relevant and ordered Defendant to produce all video recordings from November 23, 2009.  (*See* Doc. No. 38.)  Defendant has produced video recordings from three cameras from November 23, 2009, each depicting 1.6 hours of footage from 7:54 p.m. to 9:30 p.m. (*See* Resp. at 3.)  Defendant argues that there was "no reason to record footage prior to the events around 8:00 on November 23, 2009." (*Id.*)  Plaintiff argues there is "no piece of evidence [that] could more accurately or completely document the spectrum of actors present on the night of November 23, 2009 as well as the entire period of time they were present at work than the [spoliated] videos." (Mot. at 15.)  The court agrees.  There is no doubt that footage taken after the November 23, 2009, incident would show reactions of and interactions between Defendant's employees and actions and reactions of Defendant's management in response to the incident. There is no question that Plaintiff is prejudiced by the loss of these recordings, which may have supported his hostile work environment claim.

### 2. *Video from November 24, 26, 27, 30, and December 1, 2, 3 and 7, 2009*

No video footage beyond November 23, 2009, has been preserved.  Plaintiff argues that the post-November 23, 2009, video would contain evidence regarding the defendant's response

to the hostile work environment claim.  (Mot. at 15–16.)  Plaintiff has alleged several instances of racially hostile conduct that occurred after the November 23, 2009 incident.  (*See* Mot., Ex. 14 at 4–5, ¶¶ 11–13.)

Plaintiff alleges on November 27, 2009, the kitchen crew greeted Angela Mills, the employee who allegedly tied a tea bag to Plaintiff's pants, with a standing ovation upon her return to work after suspension.  (*Id.* at 26; Ex. 3, ¶ 5.)  Defendant argues an ovation is not evidence of racial discrimination.  (Resp. at 12.)  However, this court finds a video recording from this alleged incident may have shown activity conforming to and supportive of Plaintiff's claims.

Plaintiff also alleges on or about November 30, 2009, a coworker sang rap lyrics using racially offensive language, and other kitchen staff laughed.  (Mot, Ex. 14 at 5, ¶ 12.)  Defendant argues that there is no audio recorded on the video footage and thus this alleged verbal misconduct and any other allegation regarding the recitation of rap lyrics would not have been captured on the video footage.  (Resp, at 12.)  However, the court finds the video recording from the alleged rap singing incident may have shown body language and other activity conforming to and supportive of Plaintiff's claims.

Plaintiff asserts on November 27, 2009, "an unknown person clocked Plaintiff out of work at approximately 10:30 p.m. while [he] was still working" until 11:41 p.m.  (Mot., Ex. 14 at 4, ¶ 11.)  It is undisputed that there is no camera that records the area where employees clock in and out.  (Resp. at 11.)  Defendant argues, even if it existed, a video would be insufficient to prove a hostile work environment as there are multiple explanations for why this incident may

12

have occurred.  (*Id.* at 12.)  Finally, Plaintiff alleges on or about December 1, 2009, the line cook

messed up an order and, when Plaintiff asked for the missing food item, the cook put the item on

a plate and threw the plate like a Frisbee at Plaintiff.  (Mot., Ex. 14 at 5, ¶ 13.)  Plaintiff alleges

the plate almost crashed and created a lot of noise, and the line cook blamed the incident on

Plaintiff.  (*Id.*)  It is undisputed that the area where the line cook stands is not captured in the

kitchen videos.  (Resp. at 13.)  However, even though it is a close call whether the video of these

two alleged incidents would allow Plaintiff to draw the desired inference, *see Gates*, 167 F.R.D.

at 104, the court finds Plaintiff has provided evidence that some racially hostile event occurred

on four of the eight nights he worked after the November 23, 2009 incident.

Thus, the court finds that Plaintiff is prejudiced by his inability to review and eventually

present to the jury any video recordings that would corroborate his claims that he continued to be

subject to racially hostile behavior by the alleged standing ovation incident on November 27,

2009, and the rap-singing incident on November 30, 2009.  Additionally, taken as a whole, the

plaintiff has shown prejudice from his inability to review tapes that may have shown other

racially hostile behavior. As such, the court, as discussed *infra*, orders that a mandatory inference

be given as to the alleged November 27 and November 30, 2009, incidents, and a permissive

inference be given regarding the remaining dates after November 23, 2009.

### 3.    *Video from October 30, 31, and November 3, 2009*

Finally, Plaintiff argues that he is prejudiced by the spoliation of the October 30, 31, and

November 3, 2009 video recordings.  (Mot. at 14–15.)  Plaintiff argues that "[v]ideo recordings

from these three shifts potentially contained evidence of [the] discriminatory conduct, which

Plaintiff believes would be particularly indicative of a racially hostile work environment . . . ." (*Id.*)

Plaintiff has alleged discriminatory conduct on October 30, 2009, and October 31, 2009. Plaintiff alleges on October 30, 2009, two employees who were training him "ignored any questions the Plaintiff asked. During the course of the day one employee sang rap lyrics with word 'nigger' one or two times that day. Both men laughed afterwards as if it were a joke." (Mot., Ex. 14 at 2, ¶ 3.) The court finds the video recordings from the alleged rap singing incident, though they would not have contained the audio, may have shown activity conforming to and supportive of Plaintiff's claims.

Plaintiff also alleges that on October 31, 2009, when Plaintiff arrived at work, a coworker asked Plaintiff, "Is this your costume?" (Mot., Ex. 14, ¶ 4.) Plaintiff alleges the question was "greeted with laughter and a smirk." The court finds Plaintiff has failed to show how this evidence, even if it existed, would allow Plaintiff to draw the desired inference. *See Gates*, 167 F.R.D. at 104 (quoting 2 *Wigmore* § 291). It is undisputed that audio of the alleged laughter was not recorded. Plaintiff has not alleged any specific body language or gestures made the coworkers that would support Plaintiff's allegation.

Finally, in the supporting documents provided by Plaintiff, he has not alleged any racially discriminatory conduct took place on November 3, 2009. (*See* Mot., Ex. 14.) Thus, Plaintiff has failed meet his burden of providing some evidence "tending to show that the document actually destroyed or withheld is the one as to whose contents it is desired to draw an inference" for this date. 167 F.R.D. at 104 (quoting 2 *Wigmore* § 291).

14

### D.       *Culpability and Bad Faith*

A failure to preserve evidence may be negligent, grossly negligent, or willful, but the intentional destruction of relevant records–either paper or electronic–is clearly willful conduct. *Philips Electronics N. America Corp. v. BC Technical*, ___ F. Supp. 2d ___, No. 2:08-cv-639 CW-SA, 2011 WL 677462, at *48 (D. Utah Feb. 16, 2011) (citing *Pension Comm.*, 685 F. Supp. 2d at 463.  After the duty to preserve attaches, the failure to collect either paper or electronic records from key players, the destruction of email, or the destruction of backup tapes is grossly negligent or willful behavior.  *Id.* (citing *Pension Comm.*, 685 F. Supp. 2d at 455).  Moreover, "[b]ad faith, or culpability, 'may not mean evil intent, but may simply signify responsibility and control.' "  *Id.* (quoting *Phillip M. Adams & Associates, L.L.C. v. Dell, Inc.*, 621 F. Supp. 2d 1173, 1193 (D. Utah 2009)).

The court finds the defendant is highly culpable for the failure to preserve the evidence after its receipt of the preservation letters.  During the hearing on the motion for sanctions, Plaintiff described Defendant's conduct as a type of "corporate arrogance."  When questioned by the court about the background of Mr. Skipworth, the restaurant manager charged with preserving the video recordings, Defense counsel stated that Mr. Skipworth is in his early 40s, has a degree in engineering, and has worked in the restaurant industry most of his life.  Mr. Skipworth testified in his deposition that he knew if he didn't preserve the recordings they would be overwritten.  (*See* Mot. Ex. 15 at 4, ll. 6–11; 9, ll. 1–14.)  Mr. Skipworth also testified that, even after reading the preservation letter, he made the decision not to preserve any footage from before 7:54 p.m. on November 23, 2009 or from any date after November 23, 2009.  (Resp., Ex.

B at 142–144.)  The court finds Mr. Skipworth, who had a preservation letter in his possession and who is of at least average intelligence and experience, made a conscious and willful decision not to take steps to preserve evidence that he knew would be destroyed without his taking action.

Additionally, Defendant, in its Response, argues that the evidence is not relevant, despite this court's previous rulings to the contrary.  However, it is not for the spoliator to determine what documents are relevant.  *Philips Electronics*, 2011 WL 677462, at *3.  Finally, the documents provided by Plaintiff show that Defendant was concerned about a pattern of racism at the Colorado Springs location and the possibility of litigation but nevertheless failed to take steps to ensure that the video recordings were preserved.  Thus, even if Defendant's intent was not evil, Defendant certainly had notice of the duty to preserve, a responsibility to do so, and understood the consequences of the failure to do so.  *See Philips Electronics*, 2011 WL 677462, at *48.

This court has observed and has chastised Defendant for several other instances of obstreperous behavior, including Defendant's corporate human resources representative's failure to take notes when conducting interviews with the defendant's employees regarding the November 23, 2009 incident, Defendant's assertion that it represented every employee of Texas Roadhouse, and its refusal to allow Plaintiff's counsel to conduct her own interviews with those employees in an obvious attempt to keep Plaintiff from obtaining evidence.

Defendant's continued obstreperous conduct goes well beyond corporate arrogance and instead appears to be a calculated position that if it does not have the evidence to produce, and thus fails to allow Plaintiff access to the evidence, it cannot be hurt in litigation.

16

The *Philips Electronics* court explained that:

> [S]poliation sanctions serve a dual function.  Not only are they meant to penalize litigants, but they also serve to deter those who might be tempted to cause the spoliation of evidence.  Lesser sanctions would not establish deterrence some litigants need regarding this behavior . . . .  One who anticipates that compliance with discovery rules, and the resulting production of damning evidence, will produce an adverse judgment will not likely be deterred from destroying that decisive evidence by any sanction less than the adverse judgment he . . . is tempted to thus evade.  In other words, courts have recognized that if parties are willing to take the risk and balance destroying evidence against turning over the proverbial smoking gun, knowing that the destruction will not result in the ultimate judgment, destruction of important evidence will occur.  The court must not inherently reward the misbehavior of companies and individuals who want to destroy incriminating evidence rather than produce it and have a judgment entered against them; litigants must be strongly discouraged, rather than encouraged in any way, to become more and more clever about how to delete and hide the destruction of electronic documents.

*Philips Electronics*, 2011 WL 677462, at *58.  The court finds Defendant's conduct in failing to preserve the video recordings from before 7:54 p.m. on November 23, 2009, or from any date after November 23, 2009, was willful and in bad faith.  Moreover, there is no way to know exactly what evidence Defendant destroyed, and there is no way to know how to place Plaintiff back into a position where it would not suffer significant prejudice as a result of Defendant's destruction of evidence.  Thus, the court next must determine what type of sanctions are appropriate.

### E.     Type of Sanctions

Sanctions for the destruction of evidence serve the three distinct remedial purposes of punishment, accuracy, and compensation.  *United States v. Koch Indus., Inc.*, 197 F.R.D. 463, 483 (N.D. Okla. 1998).  "A court should select the least onerous sanction necessary to serve

these remedial purposes.  The severity of the sanction selected for spoliation of evidence should be a function of and correspond to the willfulness of the spoliator's destructive act and the prejudice suffered by the non-spoliating party." *Koch Indus., Inc.*, 197 F.R.D. at 483.

As a general rule, the "bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) (citing *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir. 1985)).  Because only the bad faith loss or destruction of a document will "support an inference of consciousness of a weak case," no adverse inference should arise from spoliation that is merely negligent. *Id.* (citing *Vick v. Tex. Emp't Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)).  *But see Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991) (concluding that, to restore the evidentiary balance, an adverse inference should arise even when the spoliation was merely negligent, because the prejudice to the other party is the same, regardless of the despoiler's intent).

Courts have generally not imposed a similar requirement of bad faith when considering other sanctions for the spoliation of evidence, however.  *See, e.g.*, *Allstate Ins. Co. v. Sunbeam Corp.*, 53 F.3d 804, 806–07 (7th Cir. 1995) (upholding dismissal of claims as sanction for spoliation, even in absence of bad faith on part of despoiler); *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 267–69 (8th Cir. 1993) (upholding exclusion of evidence as sanction for spoliation, even in absence of bad faith on part of despoiler); *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368–69 (9th Cir.1992) (same).

### *1.     Pre-November 23, 2009 Video*

Plaintiff requests that Defendant be excluded from offering evidence of Plaintiff's demeanor before November 23, 2009.  (Mot. at 27.)  This court determined *supra* that Plaintiff is prejudiced only by the spoliation of the alleged October 30, 2009 rap singing video, which may have shown activity conforming to and supportive of Plaintiff's claims.  The court declines to order this sanction, as it would not correspond Defendant's act in destroying the recording and the prejudice suffered by the Plaintiff.  *Koch Indus., Inc.*, 197 F.R.D. at 483.  Plaintiff's demeanor before the November 23, 2009, incident is highly critical to his claims.  The plaintiff has received video recordings from eight days prior to November 23, 2009.  To the extent Defendant wishes to proffer evidence of Plaintiff's demeanor prior to the November 23, 2009, incident using these video recordings, Plaintiff will have equal opportunity to present rebuttal evidence.  The court does, however, order that Defendant be prohibited from introducing evidence of Plaintiff's demeanor that is inconsistent with the video actually produced for those missing days.

### *2.     Post-November 23, 2009 Video*

Plaintiff requests, as a sanction for the destruction of the November 23, 2009, video recordings, a conclusive factual finding that Plaintiff was subjected to a hostile work environment after November 23, 2009.  (Mot. at 26.)  The court declines to order that such harsh legal conclusion be given as a sanction.  Plaintiff has the most important and damning evidence from November 23, 2009, in its possession.  The sanction requested by Plaintiff would not

correspond to the willfulness of Defendant's act in destroying the video or the prejudice to Plaintiff as a result of the destruction.  *Koch Indus., Inc.*, 197 F.R.D. at 483.

Plaintiff also argues that he is entitled to an inference that the hostile work environment continued beyond November 23, 2009.  (Mot. at 26–27.)  This court determined *supra* that Defendant's conduct failing to preserve the video recordings from before 7:54 p.m. on November 23, 2009, and from any date after November 23, 2009, was willful and in bad faith. As such, Plaintiff is entitled to an inference.  This court orders, as discussed *supra*, that as to the alleged standing ovation incident on November 27, 2009, and the rap-singing incident on November 30, 2009, the trial court give a mandatory inference jury instruction that the standing ovation incident and the rap singing incidents occurred and that such incidents are evidence supporting Plaintiff's claim of a hostile work environment.

As to the spoliated tapes for November 24, 26, 27, 30, and December 1, 2, 3 and 7, 2009, the jury will be instructed that they may infer, but are not required to infer, the missing videotapes would have provided evidence harmful to the defendant's defenses and potentially supportive of Plaintiff's claims.

### 3.    *November 23, 2009 Video*

Plaintiff also argues that Defendant should not should not be allowed to offer evidence concerning any events that occurred in areas of the restaurant not preserved on videotape during Plaintiff's tenure as an employee.  Because this court determined *supra* that Defendant was not under a duty to preserve videotapes outside of the kitchen area for any day other than November 23, 2009, this request for sanctions is overly broad.  However, this court does order that

20

Defendant be excluded from presenting evidence regarding events that would have been captured on video in any area of the restaurant on prior to 7:54 p.m. or after 9:30 p.m. on November 23, 2009.  This court also orders that Defendant be excluded from cross-examining Plaintiff's witnesses as to the truthfulness of any evidence of events that occurred prior to 7:54 p.m. or after 9:30 p.m. on November 23, 2009.

### 4.    *Attorney Fees*

The court also finds that, pursuant to Fed. R. Civ. P. 37(b)(2)(C), an appropriate sanction for Defendant's faith spoliation of the evidence should include imposition of attorney fees and costs for all of the proceedings related to the spoliation motion, including the briefing and the hearing.  Plaintiff shall file an submit an affidavit of the costs associated, including attorney fees, by May 13, 2011.  Defense counsel will file a response regarding reasonableness, if any, by May 20, 2011.  Plaintiff will file a reply, if any, by May 27, 2011.

Accordingly, it is **ORDERED** that sanctions are awarded consistent with this Order and as set forth above.

Dated this 2nd day of May, 2011.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge